[Docket Nos. 10 & 12]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

UNITED STATES OF AMERICA,

v.

ROBBY VELAZQUEZ,

Defendant.

Crim. No. 23-657 (RMB)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge:**

Defendant Robby Velazquez asks this Court to suppress a handgun and magazines that Camden County Police Officers recovered from his backpack during a warrantless stop and search. [Docket No. 10.] Velazquez argues the police unlawfully detained him and searched his bag, and so, the exclusionary rule bars the Government from using that handgun as evidence against him at trial. He also asks this Court to throw out the indictment charging him with being a felon-in-possession of a handgun and ammunition, in violation of 18 U.S.C. § 922(g)(1). [Docket No. 12.] He contends § 922 is facially invalid and unconstitutional as applied to him because the statute violates his Second Amendment rights to keep and bear arms.

For the below reasons, this Court **DENIES** Velazquez' motion to suppress because the police lawfully stopped him and searched his backpack. While the Court denied Velazquez' motion to dismiss the indictment on the record, *see* Docket No. 19, the Court writes to explain why. In short, this Nation has a historical tradition of disarming dangerous individuals and those who would endanger the public's safety if allowed to have a firearm. Velazquez—a convicted firearms trafficker—falls within the class of people the Founders and the

Reconstruction era would have disarmed because he would threaten the public's safety if allowed to have a firearm.

## I.  BACKGROUND

### A.  Velazquez' Prior Firearms Convictions

In 2015, Velazquez pled guilty to conspiracy to traffic firearms without a license contrary to 18 U.S.C. § 922(g)(1)(A) in violation of 18 U.S.C. § 371, and possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d).  *United States v. Robby Velazquez*, Docket No. 15-cr-339, ECF No. 25.  According to the Government, from March 2014 to February 2015, Velazquez conspired with others to unlawfully traffic about 30 firearms, with Velazquez personally involved in 27 of those transactions.  [Gov't Mem. of Law in Opp'n to Velazquez's Mot. to Suppress (Gov't Br. I) 2 (Docket No. 13).]  The Court sentenced Velazquez to 51 months of imprisonment on his convictions with three years of supervised release.  *Velazquez*, Docket No. 15-cr-339, ECF No. 37.  Following his sentencing, Velazquez violated the terms of his supervised release by, among other things, using fentanyl and not submitting to drug testing.  *Id.* ECF Nos. 45, 51, 54, 69.  This Court imposed another two-year term of supervised release and barred Velazquez from, among other things, entering the City of Camden without his probation officer's permission.  *Id.* ECF No. 70.  In March 2023, Velazquez stopped reporting to probation, and so, this Court issued a warrant for his arrest in May 2023.  *Id.* ECF Nos. 72-73.  The warrant was entered into the National Crime Information Center the day the Court issued it.  [Docket No. 20.]

### B.  Velazquez' Arrest and Pending Charges

A few days after this Court issued the arrest warrant, Camden County Police Officer Elliot Romero (Romero) was patrolling Mount Vernon Street in Camden in his police cruiser

when he observed Velazquez.  [Hr'g Tr. 11:9 to 14; 13:12 to 25.]  Romero, a four-year veteran of the Camden County Police Department (CCPD) who has conducted "many drug arrests" and observed "hundreds" of hand-to-hand drug sales, saw Velazquez "making contact with people, exchanging items and then breaking contact."  [*Id.* at 11:15 to 25; 14:8 to 15; *see also id.* at 48:25 ("It looked like they were exchanging items.").]  Romero knows the Mount Vernon area where he observed Velazquez to be "a notorious drug set"— a location where individuals distribute "narcotics outside in plain view of the public."  [*Id.* at 12:21 to 25; *see also id.* at 18:22 to 23 ("[T]his area is well known for narcotics.").]  Romero and other CCPD officers have made many arrests for the possession and distribution of drugs in that area.  [*Id.* at 13:1 to 5.]

When Romero first saw Velazquez engage with the other individuals, the officer noticed him standing "slightly to the side" of a box truck in a vacant lot.  [*Id.* at 15:8 to 11; 46:1-2.]  Romero saw Velazquez attempt to "avoid[] contact" when he noticed the officer patrolling.  [*Id.* at 14:19 to 23.]  Based on his training and experience, Romero believed Velazquez was "selling drugs . . . because he's avoiding contact with me at that point."  [*Id.* at 15:1 to 3.]  Believing he just observed a drug transaction, Romero then decided to stop and arrest Velazquez for loitering with the intent to distribute drugs.  [*Id.* at 21:23 to 22:1; 50:6 to 12.]

While unclear on the timing between his first observation of Romero and his decision to stop him, Romero drove around the block to approach Velazquez from a different side of the lot so he would not see the officer.  [*Id.* at 19:14 to 20; 43:5 to 15; 44:10 to 11.]  Romero activated his body camera as he walked through the lot.  [*Id.* at 17:9 to 11.]  According to Romero, following CCPD policy, he only activates his body camera when he "is being

3

dispatched to something or when [he is] self-initiating contact with somebody," otherwise, the camera's battery would drain "extremely quickly." [*Id.* at 17:12 to 19.] He deactivates the camera when he reaches a "secure facility" in the case of an arrest, or when he finishes his contact and is back at his police car. [*Id.* at 17:19 to 21; 52:17 to 53:2.] The officer does not activate his body camera when on routine patrol in his vehicle because the camera would not capture what the officer is observing. [*Id.* at 17:25 to 18:5.]

As he walked through the lot, Romero observed Velazquez straddling a bike in front of the box truck. [Gov't Ex. A (Romero's Body Camera Video).] Velazquez had on a red backpack. [*Id.*] While approaching Velazquez, Romero asked him "What's up, bro?" which prompted Velazquez to place an object on the ground near his feet. [*Id.*] When Romero saw this, he told Velazquez "nope, nope, nope," "you good," to "relax," and not to "go anywhere." [*Id.*] But as Romero got closer, Velazquez began to move on the bike. [*Id.*] Romero placed his hand on the bike's handlebar while instructing Velazquez to "hop off the bike." [*Id.*] Although Velazquez questioned why he had to get off his bike, he did so after Romero asked him a third time. [*Id.*] But Velazquez began to back away from the officer. [*Id.*] As Romero closed in, Velazquez turned his back toward the officer and attempted to run away. [*Id.*] Romero grabbed Velazquez resulting in a struggle with Velazquez attempting to break away from the officer. [*Id.*]

Romero wrestled Velazquez to the ground, repeatedly instructing him to "stop" and to "stop fighting" while trying to handcuff him. [*Id.*; *see also* Hr'g Tr. 23:16 to 18.] Velazquez refused to comply with the officer's commands, continued to struggle, and tried to flee. [Gov't Ex. A; *see also* Hr'g Tr. 23:20 to 22; 29:22 to 25.] With the help from another officer, Romero subdued Velazquez and handcuffed him after a few minutes. [Gov't Ex. A; *see also* Gov't Ex.

B (Officer Derek Saville's Body Camera Video).]  Romero then briefly searched Velazquez in the lot because he did not know if he had any weapons or needles on him.  [Hr'g Tr. 32:18 to 25.]  The officer recovered Suboxone from Velazquez' person.  [*Id.* at 38:13 to 15.]  Romero could not locate the item Velazquez placed on the ground when the officer first approached him.  [*Id.* at 54:1 to 11.]

Romero and the officers then brought Velazquez to a patrol car and searched him again.  [*Id.* at 39:4 to 11.]  CCPD Officer Justin Brown (Brown) assisted with the search, and removed a lanyard from Velazquez' neck.  [Gov't Ex. D (Brown's Body Camera Video).]  After the officers placed Velazquez in the patrol car, Brown then searched Velazquez' backpack under CCPD policy.  [*Id.*; *see also* Hr'g Tr. 64:3 to 21; 65:24 to 66:9.]  The officer found one of the pockets had been locked with a small pad-lock.  [*Id.* at 67:7 to 23; *see also* Gov't Ex. D.]  Brown located the key on the lanyard that the officers removed from Velazquez.  [*Id.*]  After unlocking it, Brown recovered a 9-millimeter handgun and two loaded magazines in Velazquez' bag.  [*Id.*]  The officers also uncovered "white crystal substances" from Velazquez (either from his person or his backpack) that later determined to be fentanyl and cocaine.  [*Id.* at 39:12 to 40:7; *see also* Gov't Ex. C (Lab Report dated June 2, 2023).]

CCPD policy requires officers to search an arrestee and the arrestee's personal belongings before taking the arrestee to Central Booking.  [Hr'g Tr. 64:9 to 15; *see also* Gov't Ex. E (Memo entitled "Pre-Incarceration Searches").]  According to the policy, CCPD officers must search the arrestee and their property on the street for any weapons, contraband, or other items that may pose a danger to the police, the arrestee, or the individuals in Central Booking.  [*Id.* at 73:9 to 75:12.]  The officers must check their own weapons before entering Central Booking so they must ensure the arrestee or their personal property have no weapons

or items that could endanger the officers, the arrestee, or others.  [*Id.* at 71:5 to 12.]  If the officers find any weapons or contraband during the search on the street, they bring those items to the Crime Scene Investigation Unit.  [*Id.* at 75:1 to 12.]  The officers then research the arrestee and their personal property again in Central Booking, and make a written inventory of the property recovered.  [*Id.* at 73:2 to 20; *see also* Gov't Ex. E.]

A federal grand jury later indicted Velazquez for being a felon-in-possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  [Docket No. 1.]

### C. The Evidentiary Hearing

After Velazquez moved to suppress the handgun and ammunition recovered from his backpack, the Court held an evidentiary hearing where the Government presented testimony from Romero and Brown.  [Hrg. Tr. 10, 62.]  Romero testified on his initial observations of Velazquez, his encounter with him, and the ultimate arrest.  Romero also testified on CCPD policy on investigatory stops and arrests.  [*Id.* at 41:6 to 23.]  That policy requires officers to request the name and identification of any individual stopped.  [*Id.*]  The officers must then search the name and identification for any outstanding warrants.  [*Id.*] If the search reveals the person stopped has an outstanding warrant, the officers must arrest the person and serve the warrant. [*Id.*]  Brown testified to his search of Velazquez and the backpack, and CCPD's policy on inventory searches of an arrestee and his/her personal property.

## II. THE PARTIES' ARGUMENTS

### A. Motion to Suppress

Velazquez moves to suppress the handgun arguing Romero unlawfully seized him because the officer lacked probable cause that he committed any crime to justify the stop. [Velazquez' Mem. of Law in Supp. of Mot. to Suppress (Def. Br. I) 3-4 (Docket No. 10-1).]

He claims the officers arrested him without probable cause and no exception to the warrant requirement justifies the warrantless search of his backpack. [*Id.*] Velazquez argues the search incident to arrest exception to the warrant requirement cannot justify the search because at the time of the search, the officers had secured Velazquez in the patrol car and he no longer could access the bag. [*Id.* at 4-5.]

The Government opposes the motion, arguing Romero lawfully stopped Velazquez because the officer had reasonable suspicion to believe Velazquez had engaged in a drug transaction based on his observations, and so, Romero had the right to make an investigatory stop. [Gov't Br. I at 10-13.] In addition, the Government contends Velazquez' furtive movements—placing an object on the ground as Romero approached him—reasonably increased Romero's suspicion to justify a stop. [*Id.* at 12-13.] The Government rejects Velazquez' argument that Romero seized him when the officer grabbed his bike. [*Id.* at 13.] According to the Government, Romero only seized Velazquez after the officer grabbed him when he tried to flee. [*Id.*] And pointing to Velazquez' attempted flight, the Government contends that attempt gave Romero probable cause to arrest him. [*Id.* at 14.]

The Government also argues that Velazquez' resistance gave Romero an independent reason to arrest him even if the officer lacked reasonable suspicion to stop Velazquez. [*Id.* at 14-15.] According to the Government, a person who refuses an officer's commands is subject to arrest even if the initial police-citizen encounter is unlawful. [*Id.* at 15 (quoting *Torres v. City of Atl. City*, 2007 WL 4259978, at *5 (D.N.J. Nov. 30, 2007) (Bumb, J.)).] The Government goes onto explain that Velazquez' resistance also provided an independent reason to search his backpack. [*Id.* at 15.]

7

Turning to Brown's search of the backpack, the Government relies on the "search before transportation" and inventory search exceptions to the warrant requirement. [*Id.* at 16-19.] Pointing to the Third Circuit's decision in *United States v. Mathews*, 532 F. App'x 211 (3d Cir. 2013), the Government contends police officers can lawfully search an arrestee's luggage where the officers make the arrest in a public place and must transport the arrestee and his luggage to police headquarters. [*Id.* at 17-18.] In addition, the Government contends the inventory search exception justifies the warrantless search because the officers followed CCPD's "Pre-Incarceration Searches" policy. [*Id.* at 18-19; *see also* Gov't Ex. E.]

Finally, the Government invokes the inevitable discovery doctrine to justify the officers' conduct. [*Id.* at 19-20.] The Government argues this Court had issued a warrant for Velazquez' arrest for violating the terms of his supervised release. [*Id.*] The Government asserts that once Romero had learned of the warrant, the officer would have lawfully arrested him, searched the backpack, and uncovered the handgun. [*Id.*] Thus, even if the officers' warrantless search Velazquez' backpack violated his Fourth Amendment rights, the inevitable discovery doctrine still allows the Government to use the handgun as evidence against him. [*Id.* at 20.]

### B. Motion to Dismiss

Velazquez moves to dismiss the indictment raising facial and as-applied challenges to § 922. [Velazquez Mem. of Law in Support of Mot. to Dismiss (Def. Br. II) 1 (Docket No. 12-1).] Relying on the United States District Court for the Southern District of Mississippi's decision in *United States v. Bullock*, ___ F. Supp. 3d ____, ____, 2023 WL 4232309 (S.D. Miss. June 28, 2023), Velazquez argues that § 922 is facially invalid. [*Id.*] Turning to his as-applied

challenge, Velazquez contends he has never been convicted of a crime of violence, and so, §
922 cannot be enforced against him.  [*Id.*]

The Government contends § 922 is constitutional on its face and as applied to
Velazquez.  [Gov't Mem. of Law in Opp'n to Velazquez's Mot. to Dismiss (Gov't Br. II) 6-
22 (Docket No. 14).]  The Government rejects Velazquez' reliance on *Bullock*, arguing *Range
v. Garland*, 69 F.4th 96 (3d Cir. 2023) (*en banc*) controls this motion.  [*Id.* at 6.]  While the
Government disagrees with *Range*'s holding, the Government points out that *Range* is a
self-professed "narrow opinion" and the Eighth and Tenth Circuits have upheld § 922's
constitutionality against facial and as-applied challenges.  [*Id.* at 5-6.]

Turning to the merits of Velazquez' motion, the Government argues Velazquez cannot
prevail on his Second Amendment challenge under *New York State Rifle Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022).  The Government first contends that Velazquez has failed to show the
Second Amendment protects his course of conduct—carrying a firearm while selling drugs.
[*Id.* at 9-13.]  Next, the Government asserts that even if the Second Amendment applies here,
the Government contends this Nation has a historical tradition of disarming dangerous
individuals like Velazquez.  [*Id.* at 14-21.]  Lastly, the Government contends Velazquez lacks
any Second Amendment rights because he was on supervised release when he possessed the
handgun.  [*Id.* at 13-14.]  The Government argues a person's Second Amendment rights may
be limited during a period of probation.  [*Id.* at 14 (citing *United States v. Shaw*, 2023 WL
3619416, at *4-7 (D.D.C. May 24, 2023)).]

## III.  DISCUSSION

### A. Credibility Determinations

On a motion to suppress evidence, trial courts must determine the credibility of witnesses, weigh the evidence, and reach "any 'inferences, deductions and conclusions to be drawn from the evidence.'"  *United States v. Cole*, 425 F. Supp.3d 468, 473 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)); *see also United States v. Graham*, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *Gov't of the Virgin Island v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)).   Trial courts may "accept or reject any or all of a witness's testimony."  *Graham*, 2014 WL 3396495, at *4 (quoting *United States v. Demings*, 787 F. Supp.2d 320, 326 (D.N.J. 2011)).   In assessing a witness's credibility, courts "should consider:  the witness's demeanor and manner on the stand; the witness's ability to accurately recollect the matters at hand; and the extent to which the testimony withstands a common-sense test of reason and logic."  *United States v. Harris*, 2023 WL 5425395, at *4 (D.N.J. Aug. 23, 2023).

Having had the opportunity to view Romero's and Brown's demeanor during questioning, the Court finds them both credible.   Both officers testified in a calm, straight-forward manner, they acknowledged mistakes and appeared honest when testifying they could not recall an answer.  For example, Romero testified that he "wish[ed] he had been clearer" in his police report on where he located drugs on Velazquez—either in the backpack or on his person.  [Hr'g Tr. 38:16 to 23.]   In addition, despite vigorous cross-examination, Romero candidly admitted that he could not recall how long he waited between his initial observation of Velazquez and his decision to stop him.   [*Id.* at 43:5 to 15, 44:10 to 11.]   The

10

officers' body camera footage the Court received into evidence also supports their testimony. Thus, the Court credits Romero's and Brown's testimony in full.

### B. Motion to Suppress

#### 1. Fourth Amendment Principles

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures."   U.S. Const. amend. IV.   "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies."  *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010)).  Where, as here, the Government obtains evidence from a warrantless search or seizure, then it must show by a preponderance of the evidence that an exception to the warrant requirement applies.  *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992).  Otherwise, the exclusionary rule bars the admission of the illegally obtained evidence.  *Id.*

An investigatory or *Terry* stop is one such exception to the warrant requirement.  *Terry v. Ohio*, 392 U.S. 1 (1968).  A police officer may make an investigatory stop "when [the] officer has a reasonable, articulable suspicion that criminal activity is afoot[.]"  *Hester*, 910 F.3d at 84 (alterations in original) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  To justify an investigatory stop, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21.  To determine whether a stop is justified, courts "must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *United States v. Yamba*, 506 F.3d 251, 255 (3d Cir. 2007) (quoting *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984)); *see also United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012)

11

("In evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior.'" (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002))).   This is an "objective standard" requiring courts to determine whether "the facts available to the officer at the moment of the seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate[.]"   *Terry*, 392 U.S. at 21-22.    In the totality of circumstances inquiry, courts should consider the "officer's specialized knowledge and investigative inferences," the reputation of the area where the stopped occurred (high crime), the time of the stop, the suspect's movements, any suspicious conduct, or behavior "that conforms to the police officers' specialized knowledge of criminal activity."   *Hester*, 910 F.3d at 87 (quoting *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006)).

The government's need to show a reasonable articulable suspicion "is only triggered by a seizure, which occurs when an officer applies physical force or when a person submits to an officer's 'show of authority[.]'"   *Id.* at 84 (alteration in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)).   Thus, when faced with a motion to suppress, courts must first determine whether a seizure occurred, and if so, when.   *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014).   A person is constitutionally seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."   *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

### 2.   Romero's Seizure of Velazquez

All agree Romero seized Velazquez, but they disagree on when.   Velazquez argues Romero seized him when the officer grabbed his bike preventing him from leaving.   The

Government contends Romero first seized Velazquez when the officer physically placed his hands on him to stop him from fleeing.   Even if Romero constitutionally seized Velazquez by grabbing the bike, the Court finds Romero had reasonable suspicion to detain him before touching the bike.

Indeed, courts must examine what the officer knew at the time of the stop.  *See United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) ("Reasonable suspicion must exist at the time of the *Terry* stop.").  Before even approaching Velazquez, Romero observed him engage in a hand-to-hand transaction with others in a high crime area that the officer suspected to be a drug transaction.  Romero and other CCPD officers know the Mount Vernon area to be a "notorious drug set" and they have made many drug-related arrests there.  [Hr'g Tr. 12:21 to 25, 13:1 to 5, 18:22 to 23.]  Romero also noticed Velazquez try to "avoid contact" after seeing the officer in his patrol car.  [*Id.* at 14:19 to 23.]

Those observations, viewed through the lens of Romero's training and experience, gave the officer reasonable suspicion to stop Velazquez for suspected drug trafficking.  *United States v. Lopez*, 441 F. App'x 910, 913-14 (3d Cir. 2011) (finding officers had reasonable suspicion to make investigatory stop based on officers' observations of individuals approaching each other and exchange a small article because those "circumstances gave rise to an inference of drug-related activity"); *United States v. Whitfield*, 634 F.3d 741, 744-45 (3d Cir. 2010) (concluding officer had reasonable suspicion to conduct investigatory stop when officer believed he saw a drug transaction in a high crime area known for drug trafficking based on a "hand-to-hand exchange" and a later "effort to conceal something"); *United States v. Miller*, 2009 WL 3617753, at *2 (E.D. Pa. Nov. 3, 2009) (finding police had reasonable

suspicion to stop defendant for a suspected drug transaction based on officers' observation of defendant in "a high crime area standing on a corner touching hands with another man").

On top of those observations, Romero saw Velazquez place an object on the ground as the officer approached him and asked "What's up, bro." [Gov't Ex. A.] That furtive movement, coupled with Romero's other observations of Velazquez, solidified the officer's reasonable suspicion to stop him. *Kimbrew v. Evansville Police Dep't*, 867 F. Supp. 818, 821-23 (S.D. Ind. 1994) (finding officers had reasonable suspicion to conduct investigatory stop where officers received reports of drug activity and when approaching group of individuals, officers observed an individual throw an object to the ground and then saw "furtive movements and concerned gestures"). Indeed, "[a] suspect's furtive movements can contribute to an officer's reasonable suspicion that criminal activity is afoot." *United States v. Harrison*, 2018 WL 4405892, at *8 (E.D. Pa. Sept. 17, 2018); *see also District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) ("Deliberately furtive actions and flight at the approach of . . . law officers are strong indicia of mens rea." (cleaned up) (quoting *Sibron v. New York*, 392 U.S. 40, 66 (1968))). Thus, given the "considerable deference" courts must give "to police officers' determinations of reasonable suspicion," *see Brown*, 765 F.3d at 290, the Court finds Romero lawfully stopped Velazquez.

Still, Velazquez argues Romero arrested him when he placed his hands on his bike. [Hr'g Tr. 79:20 to 80:1.] And he points that Romero intended to arrest him before the officer even approached him. [*Id.*] Because police officers need probable cause to make an arrest and Romero did not have it, the argument goes, Romero unlawfully arrested him. This argument fails for two reasons.

*First*, an officer's mere use of force to restrain a suspect does not escalate an investigatory stop to a full-blown arrest requiring probable cause. *See United States v. King*, 243 F. Supp. 3d 488, 498 (D. Del. 2017) ("[A]n investigative stop does not necessarily transform into an arrest every time force is used to restrain a suspect.").   Indeed, "[a]n officer may use reasonable physical force under the circumstances to effect a *Terry*-stop without converting the stop into an arrest." *United States v. McGrath*, 89 F. Supp. 2d 569, 577-78 (E.D. Pa. 2000).   Romero's body camera footage reveals that as the officer approached, Velazquez placed an object on the ground and then began to move on his bike.  [Gov't Ex. A.]  Romero positioned himself in front of the bike and placed his hand on the handlebar to prevent the bike from moving.  [*Id.*]  Given what Romero knew then, the officer's limited use of force to restrict Velazquez' movement on the bike was reasonable under the Fourth Amendment. This is because "the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Conner*, 490 U.S. 386, 396 (1989); *see also United States v. McMillan*, 227 F. Supp. 3d 432, 438 (W.D. Pa. 2017) (finding officer's use of force against defendant by pushing him against car door twice when he exited vehicle did not escalate investigatory stop into arrest).

*Second*, an officer's subjective motives are irrelevant to whether the officer had reasonable suspicion to conduct an investigatory stop. *United States v. Santos*, 340 F. Supp. 2d 527, 534 (D.N.J. 2004) (explaining courts must "assess the stop's legality on the basis of objective factors available to the officers at the time, and not an individual officer's subjective intent"); *see also United States v. Romain*, 393 F.3d 63, 74 (1st Cir. 2004) ("In determining whether an officer had reasonable suspicion to justify a *Terry* stop . . . , the officer's subjective motives do not enter into the decisional calculus.").   The objective facts here—Velazquez'

15

presence in a high crime area, his brief exchange of unknown items with other individuals, his attempts to "avoid contact" with Romero, and placing an object on the ground as Romero approached him—were sufficient to "warrant a man of reasonable caution" to believe that Velazquez had just engaged in a drug transaction.  *Terry*, 392 U.S. at 21-22; *see also Lopez*, 441 F. App'x at 913-14.

### 3.  The Legality of Velazquez' Arrest

While Romero had reasonable suspicion to stop Velazquez, the officer needed probable cause to arrest him.   Indeed, the Fourth Amendment allows law enforcement officers to make a warrantless arrest in public so long as the officer has probable cause to believe that the suspect has, or is committing, a crime.  *Wesby*, 583 U.S. at 56.   "Probable cause is not a high bar . . . 'requir[ing] only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Id.* at 57 (citations and internal quotation marks omitted).  To determine whether an officer had probable cause to make a warrantless arrest, courts must "examine events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  *Id.* at 56-57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Florida v. Harris*, 568 U.S. 237, 244 (2013) ("In evaluating whether the State has met this practical and common-sensical [probable cause] standard, [courts] have consistently looked to the totality of the circumstances.").

Romero had probable cause to arrest Velazquez for two reasons:  (1) the officer's observation of Velazquez engage in a suspected drug transaction, his furtive movements, and attempted flight from the officer during the investigatory stop; and (2) Velazquez' obstruction of justice by trying to flee from Romero, and resisting arrest.

16

*First*, courts have found an officer had probable cause to arrest after observing the suspect engage in a suspected drug transaction and flee from the officer during an investigatory stop. *See, e.g.*, *United States v. Smith*, 282 F. App'x 143, 148 (3d Cir. 2008) (finding officers had probable cause to arrest defendant after observing defendant engage in a hand-to-hand transaction that officers suspected to be a drug transaction and defendant fled from officers after they announced their presence and approached him); *see also United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) ("It is 'well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.'" (quoting *United States v. Sharpe*, 470 U.S. 675, 705 (1985) (Brennan, J., dissenting))).  Velazquez' attempted flight, coupled with Romero's observation of the hand-to-hand transaction in a high crime area, Velazquez' furtive movements and evasive behavior, gave Romero probable cause to believe that Velazquez had committed a crime. *See United States v. Foster*, 2016 WL 438954, at *2 (D. Del. Feb. 3, 2016) (finding "officer's reasonable suspicion was elevated to probable cause" once defendant "fled from the attempted stop").

*Second*, by attempting to flee during the investigatory stop and struggling with Romero, Velazquez obstructed justice (N.J. Stat. Ann. § 2C:29-1), and resisted arrest (N.J. Stat. Ann. § 2C:29-2).   Indeed, a suspect who flees from an investigatory stop obstructs justice. *State v. Crawley*, 901 A.2d 924, 935-36 (N.J. 2006) (holding defendant may be convicted of obstruction of justice by fleeing from an investigatory stop).  And an individual who struggles with a police officer and ignores the officer's commands resists arrest.   *Morris v. U.S.*, 2014 WL 7368899, at *14 (D.N.J. Dec. 29, 2014) (finding officer had probable cause to arrest plaintiff

17

for resisting arrest where "[plaintiff] did not comply with instructions to put his hands behind his back when the officers tried to handcuff him"); *see also Caldwell v. City of Newfield*, 2007 WL 1038695, at *5 (D.N.J. March 30, 2007) (ruling officer had probable cause to arrest plaintiff for resisting arrest where plaintiff ignored the officer's instructions and "pulled away" from officer when officer tried to arrest him).   A person does not have a constitutional right to flee from an investigatory stop or resist arrest even if the initial stop was unlawful. *Crawley*, 901 A.2d at 935.

Thus, even if Romero unlawfully seized Velazquez, Velazquez' attempted flight, struggle with Romero, and refusal to comply with Romero's commands are distinct crimes giving the officer probable cause to arrest him.  *See United States v. Mattiex*, 2006 WL 2741645, at *5 (S.D.N.Y. Sept. 21, 2006) ("[A]lthough [defendant's] initial arrest may have been without probable cause, [defendant] subsequently supplied the requisite probable cause by engaging in the separate and distinct crime of resisting arrest."); *see also United States v. Johnson*, 2009 WL 1578040, at *4 n.2 (E.D. Pa. June 4, 2009) ("Even if there was a prior illegal seizure, evidence of the magazine will not be suppressed because the crimes [defendant] committed while fleeing from the police constituted independent grounds for a second, legitimate arrest.").

### 4.  The Search of Velazquez' Backpack

Even though Romero had probable cause to arrest Velazquez, the Government still needs to show an exception to the warrant requirement justifies the warrantless search of his backpack.  *United States v. Rivera-Padilla*, 365 F. App'x 343, 345 (3d Cir. 2010) ("[A] warrantless search of a closed [backpack] is an unreasonable search under the Fourth Amendment unless it is justified by one of the recognized exceptions to the warrant

requirement.").  The Government here justifies Brown's warrantless search of the backpack based on the search before transportation and inventory search exceptions to the warrant requirement.  [Gov't Br. I at 16-19.]  The Court agrees those exceptions justify the warrantless search of Velazquez' backpack on the street.

The search before transportation exception is "justified by concerns for officer safety and will be valid whether or not an officer has probable cause to believe the evidence contains contraband."  *Matthews*, 532 F. App'x at 224.  That exception allows an officer to search any luggage that an arrestee has in his possession at the time of the arrest if the luggage must accompany the arrestee to the police station.  *Id.* (holding "when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it").

Here, like in *Mathews*, the officers arrested Velazquez in public, and at the time of his arrest, Velazquez had a backpack with him.  [Gov't Ex. A.]  CCPD policy required the officers to transport Velazquez' backpack to the police station with him.  [Hr'g Tr. 66:10 to 15.]  Thus, the search before transportation exception authorized Brown's warrantless search of the backpack on the street.  *Matthews*, 532 F. App'x at 225; *see also United States v. Dorsey*, 2023 WL 5598973, at *5 n.83 (M.D. Pa. Aug. 29, 2023) (relying on search before transportation exception to reject defendant's argument that police's warrantless post-arrest search of his bags was unlawful); *United States v. Curran*, 2014 WL 2042138, at *4 (M.D. Pa. May 19, 2014) (denying motion to suppress and finding warrantless search of defendant's bags permissible under search before transportation exception), *aff'd*, 638 F. App'x 149 (3d Cir. 2016).

19

Moreover, the inventory search exception to the warrant requirement allowed Brown to search the backpack. "[T]he inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Inventory searches promote "strong governmental interests" by: (1) protecting an owner's property while in police custody; (2) guarding the police from unknown dangers lurking in an arrestee's personal property; and (3) insuring against claims for lost, damaged, or stolen property. *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). "Lawful inventory searches must be 'conducted according to standardized criteria' or established routine, consistent with the purpose of a non-investigative search." *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 n. 6 (1987)). This "tends to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 287-88 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976)). The government may show the existence of a "valid [standardized inventory search] procedure . . . by reference to either written rules and regulations or testimony regarding standard practices." *Id.* at 290 n.5 (first alteration in original) (quoting *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)).

The Government has shown Brown searched Velazquez's backpack under established routine. The CCPD "Pre-Incarceration Searches" procedures (the Inventory Search Guidelines) require arresting officers to "conduct a pat search and inventory of arrestees and their personal effects and document the property on a Prisoner Property Form" before confining the arrestee in Central Booking. [Gov't Ex. E at 4 (emphasis removed).] The officer must search and inventory, among other things, wallets, purses, and contraband. [*Id.*] At the suppression hearing, Brown expanded on the Inventory Search Guidelines, explaining that department policy requires officers to search an arrestee and his/her personal property at the

20

scene "to make sure that there's no weapons or contraband in the bag" before the officer brings the arrestee and personal property to Central Booking for processing. [Hr'g Tr. 73:9 to 14.] Brown explained these on-scene searches are routine because officers must "lock" their firearms before entering Central Booking so the officers must ensure the arrestee and his/her personal belongings do not have any weapons that could endanger the officers, the arrestee, or other detainees. [*Id.*; *see also id.* at 71:5 to 12, 76:9 to 14.] Brown also explained that the Inventory Search Guidelines require the officers to research the personal property in Central Booking and inventory the contents. [*Id.* at 71:13 to 17.]

The Inventory Search Guidelines, as elaborated by Brown's testimony, afforded the officer no discretion to search Velazquez' backpack—he had to do it, otherwise, he would be disciplined. [*Id.* at 66:13 to 15.] By removing the officer's discretion, the Inventory Search Guidelines prevents officers from engaging in the forbidden "general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990); *see also United States v. Wilson*, 2017 WL 11392592, at *5 (S.D. Fla. Sept. 27, 2017) (finding warrantless search of vehicle proper under inventory search exception where department policy mandated search and officer "had no discretion not to conduct an inventory search"), *aff'd*, 979 F.3d 889 (11th Cir. 2020). The CCPD's policy requiring on-scene searches—established by Brown's credible testimony—serves one of the inventory search exceptions "strong governmental interests . . . to guard the police from danger." *Mundy*, 621 F.3d at 287 (quoting *Bertine*, 479 U.S. at 372). Thus, the Court finds Brown properly searched Velazquez' backpack, and lawfully seized the firearm and magazines.

### 5.  The Inevitable Discovery Doctrine

Finally, the Government contends the inevitable discovery doctrine bars suppression of the handgun and magazines.  [Gov't Br. I at 19-20.]   The Court agrees.  The inevitable discovery doctrine allows the introduction of evidence obtained from an unlawful search "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)).  The government can carry that burden "by demonstrating that the police, following their routine procedures, would have uncovered [the evidence.]"  *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020).  The government must point to "historical facts capable of ready verification, and not speculation."  *Id.* (quoting *Vasquez De Reyes*, 149 F.3d at 195).

Here, the Government has shown the officers would have discovered the firearm and magazines through routine procedures.  Indeed, CCPD policy requires officers making a "compelled stop" to determine the person's identification, and then check for outstanding warrants.  [Hr'g Tr. 41:6 to 16.]  If the officer discovers the person stopped has an outstanding warrant, the officer must serve the warrant and arrest the person.  [*Id.* at 41:17 to 20.]  Indeed, once an arrest warrant issues, "it becomes an officer's duty to arrest the suspect."  *State v. Jones*, 667 A.2d 1043, 1048 (N.J. 1995) (quoting *Smith v. Gonzales*, 670 F.2d 522, 527 (5th Cir. 1982)).  But Velazquez prevented that from happening by trying to flee from Romero and then resisting arrest.  [Gov't Ex. A; *see also* Hr'g Tr. 40:16 to 19.]  Had Romero obtained Velazquez' name and conducted a warrant check, the officer would have learned of the arrest warrant this Court issued that was entered into the National Crime Information Center

(NCIC).  [Docket No. 20.]  *See also United States v. McDonald*, 606 F.2d 552, 554 (5th Cir. 1979) ("NCIC printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause for arrest.").

If Romero had arrested Velazquez on the outstanding warrant, the officers would have searched his backpack during a routine inventory search (discussed above).  Thus, they would have inevitably discovered the handgun and magazines.  *See Mathews*, 532 F. App'x at 214, 225 (finding handgun would have been inevitably discovered during an inventory search at police station where police arrested defendant on outstanding warrants); *see also United States v. Clark*, 2023 WL 2541114, at *9 (E.D. Va. Mar. 16, 2023) (applying inevitable discovery doctrine to warrantless pat-down search because officer would have recovered gun and drugs during search incident to arrest of defendant based on defendant's outstanding arrest warrant); *United States v. Umphryes*, 2010 WL 1626334, at *5 (E.D. Mich. Mar. 19, 2010) (upholding warrantless search under inevitable discovery doctrine because had officer searched defendants' name, officer would have properly identified him, located outstanding arrest warrants, arrested him, and recovered firearm during a search incident to arrest). Accordingly, the Court **DENIES** Velazquez' motion to suppress.

**C. Motion to Dismiss**

While the Court denied Velazquez' motion to dismiss, *see* Docket No. 19, the Court writes briefly to explain why.  Velazquez raises facial and as-applied challenges to § 922(g)(1), arguing the statute violates his Second Amendment rights to keep and bear arms.  These challenges are meritless.

The Second Amendment of the United States Constitution protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the

Supreme Court of the United States held the Second Amendment guarantees a private, individual right to keep and bear arms for self-defense.  554 U.S. 570, 592 (2008).  In doing so, the *Heller* Court went out-of-its way to explain that felon disarmament laws, like § 922(g)(1), are "presumptively lawful," writing "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 626, 627 n.26.  Two years later, the Supreme Court ruled the Second Amendment applies equally to the federal government and states, finding "the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."  *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010).  The Court again repeated it assurances from *Heller*:  "our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'"  *Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27).

In *Bruen*, the Supreme Court held the Second Amendment applies outside the home and protects law-abiding citizens' right to carry firearms in public for self-defense.  597 U.S. at 9.  The *Bruen* Court refined the test courts must apply when confronted with a Second Amendment challenge to a firearm law—that is, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and the government must then justify its firearm law by demonstrating "the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 17.

While *Bruen* shook up Second Amendment jurisprudence, several Justices went out-of-their way to clarify that *Bruen* said nothing about the validity of felon disarmament laws like § 922.  *Id.* at 72 (Alito, J. concurring) ("Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns."); *see also id.* at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (explaining

24

"the Second Amendment allows a 'variety' of gun regulations" and that *Heller* and *McDonald* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons"); *id.* at 129-30 (Breyer, J., dissenting, joined by Sotomayor, J. and Kagan, J.) (understanding *Bruen* "to cast no doubt on that aspect of *Heller*'s holding" that felon disarmament laws are "presumptively lawful"). Thus, *Bruen* reaffirms that felon-in possession laws, like § 922(g)(1), are presumed to be constitutional.

Still, the Court examines Velazquez' challenges under *Bruen's* text-and-history-based framework. In doing so, the Court remains mindful of the Supreme Court's repeated assurances that felon disarmament laws are presumptively lawful. *Range*, 69 F.4th at 111 (Ambro, J. concurring, joined by Greenaway, Jr., J., and Montgomery-Reeves, J.) (explaining that given the Justices' statements in *Bruen* that "felon-in-possession laws remain presumptively lawful . . . a sound basis exists for § 922(g)(1)'s constitutional application in a substantial amount of cases [and] [a]ny historical inquiry that reaches a contrary result must be wrong in view of the answer the Supreme Court has already supplied").

### 1. Velazquez' As-Applied Challenge

To succeed on an as-applied challenge, Velazquez must show § 922(g)(1) as applied to him violates his Second Amendment rights to keep and bear arms. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."). Under *Bruen*, this Court must first determine whether the Second Amendment's text covers Velazquez and his proposed course of conduct. *Range*, 69 F.4th at 101 (explaining that "[a]fter *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct").

If so, then the Government must show § 922(g)(1) as applied to Velazquez "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 103 (quoting *Bruen*, 597 U.S. at 24).

Unquestionably, Velazquez is one of "the people" within the meaning of the Second Amendment. *Id.* at 103. His prior felony convictions and that he was on supervised release do not diminish that finding. *See id.* at 102-03 (rejecting government's argument that only "law-abiding, responsible citizens" are among "the people" protected by the Second Amendment).

But being one of "the people" does not carry Velazquez very far because this Court gravely doubts the Second Amendment's text protects his conduct—possessing a firearm while allegedly engaging in drug trafficking. Indeed, in *McDonald*, the Court recognized that *Heller*'s central holding is "that the Second Amendment protects a personal right to keep and bear arms for *lawful purposes.*" 561 U.S. at 780 (emphasis added). And in *Range*, the Third Circuit found the Second Amendment "conduct" inquiry to be an "easy question" to resolve because Range sought "to possess a rifle to hunt and a shotgun to defend his home"—conduct that "tracks the constitutional right as defined by *Heller*." 69 F.4th at 103.

Nothing in the record suggests Velazquez carried the firearm for a lawful purpose. Rather, the credible evidence before this Court reveals Velazquez possessed the firearm in connection with an alleged drug deal. *United States v. Porter*, 630 F.3d 1260, 1261 (9th Cir. 2011) ("[I]t cannot seriously be contended that the Second Amendment guarantees a right to use a firearm *in furtherance of drug trafficking.*" (emphasis added)). Velazquez has submitted no evidence that he was engaged in Second Amendment conduct when he possessed the gun, and therefore his as-applied challenge fails. *United States v. Jenkins*, ____ F. Supp. 3d ____,

26

____, 2023 WL 6534200, at *16  (E.D. Pa. Oct. 6, 2023) (rejecting as-applied challenge to § 922(g)(1) because "[defendant] did not affirmatively introduce any evidence that he sought to carry a gun for a Second Amendment purpose, so he did not demonstrate to a preponderance of the evidence that he was engaged in Second Amendment conduct").

Even if the Second Amendment covers Velazquez' conduct, the Government has shown that enforcing § 922(g)(1) against Velazquez adheres to this Nation's history and tradition.  The Government points to historical laws from medieval England to the Reconstruction era that disarmed dangerous felons or individuals who posed a danger to the public.  [Gov't Br. II at 16-20.]   Although in a different context, this Court extensively reviewed this Nation's (and England's) historical firearm laws, and found this Nation has a historical tradition of disarming dangerous individuals and those who would endanger the public's safety if allowed a firearm.  *Koons v. Platkin*, ____ F. Supp. 3d ____, _____, 2023 WL 3478604, at *19-24 (D.N.J. May 16, 2023) (reviewing English common law, medieval English acts and government decrees, colonial disarmament laws, state constitutional convention proposals, post-ratification disarmament laws, and reconstruction era disarmament laws); *accord Range*, 69 F.4th at 111-12 (Ambro, J. concurring, joined by Greenaway, Jr., J., and Montgomery-Reeves, J.) (explaining Founding era disarmament laws "were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed," and "[c]ertain regulations contemporaneous with the Fourteenth Amendment's ratification reaffirm the familiar desire to keep arms from those perceived to threaten the orderly functioning of society"); *see also United States v. Smith*, 2023 WL 6795807, at *5-6 (W.D. Pa. Oct. 13, 2023) (rejecting Second Amendment as-applied

27

challenge to § 922(g)(1) and observing that "[t]he disarming of people who pose a danger to society is deeply rooted in our country's legal traditions").

Velazquez—a convicted firearms trafficker—is an individual the Founders and Reconstruction era would have categorically disarmed because he poses a threat to the public's safety. *United States v. Florentino*, ___ F. Supp. 3d ___, ___, 2023 WL 7036314, at *2 (D. Mass. Oct. 26, 2023) (rejecting defendant's facial and as-applied challenges to § 922(g)(1) and ruling "[a]s a convicted gun trafficker, [defendant] poses a threat to public safety"). Indeed, an illegal firearms trafficker, like Velazquez here, helps place firearms in the hands of individuals who too should not possess guns, and as a result, furthers gun violence in this country. *Id.*; *see also United States v. Pringle*, 2023 WL 7135176, at *3 (D. Mass. Oct. 30, 2023) (rejecting as-applied challenge to § 922 by defendant previously convicted of possessing a firearm without a license since "[i]llegal firearm activity is obviously linked to violence, even if it does not directly involve violent acts"). Thus, enforcing § 922(g)(1) against Velazquez does not violate his Second Amendment rights.[1]

Moreover, Velazquez's post-conviction conduct justifies his disarmament. *Range* illustrates this point. There, Range sought to buy a rifle for hunting and a shotgun for his home for self-defense but could not because of his prior misdemeanor conviction for making a false statement to obtain food stamps. *Range*, 69 F.4th at 98-99. Even though he completed his sentence, paid restitution, and had a criminal history "limited" to minor motor vehicle offenses, § 922 barred his possession of firearms because of his misdemeanor conviction. *Id.*

---

[1] Velazquez' reliance on *Bullock* to support his motion is misplaced because the facts there are inapposite. There, the district court held the Government failed to meet its burden under *Bruen* based on a "three-and-a-half-page response brief" which proffered only caselaw and no historical sources. *See* 2023 WL 4232309, at *29-30 ("Missing from this brief, in sum, is any example of how American history supports § 922(g)(1)[.]"). The Government's briefing here, coupled with the Court's own research, reveal the historical tradition that *Bruen* requires.

When Range tried to buy a firearm, the state's background system rejected his application because of his misdemeanor conviction. *Id.* Thinking the rejection was a mistake, Range's wife then bought him a rifle. *Id.* When Range learned he was barred from buying a firearm, he sold the rifle his wife gifted him. *Id.*

Range sought a declaration that § 922(g)(1) as applied to him violated his Second Amendment rights. The Third Circuit, sitting *en banc*, agreed, and found the Government failed to show a historical tradition of disarming individuals like Range. *Id.* at 105. The *Range* court noted that historical laws revealed that a "felon could repurchase arms after successfully completing his sentence and reintegrating into society," which according to the majority, "aptly describes Range's situation." *Id.*

Unlike *Range*, Velazquez never completed his sentence, and he was on supervised release when he possessed the firearm. Moreover, at the time he possessed the firearm, he was a fugitive of the law. This Court issued an arrest warrant because he violated the terms of his supervised release. Simply put, Velazquez is not like Range.

## 2. Velazquez' Facial Challenge

To prevail on a facial challenge, Velazquez "must establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In other words, Velazquez must show § 922(g)(1) "is unconstitutional in all of its applications." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418 (2015) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008)). Velazquez faces a daunting task because a facial challenge is "the most difficult challenge to mount successfully." *Salerno*, 481

U.S. at 745.   Velazquez cannot carry his heavy burden to succeed on his facial challenge for two reasons.

First, because Velazquez cannot show that § 922(g)(1) is unconstitutional as applied to him, his facial challenge must fail.   *Mitchell*, 652 F.3d at 416 ("Because the statute is constitutional as applied to [defendant], he has not shown that 'there is no set of circumstances" under which the statute may be applied constitutionally.'"); *see also United States v. Ames*, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023) (rejecting facial challenge to § 922(g)(1) because defendant could not even show statute was unconstitutional as applied to him).

Second, courts throughout the country have consistently rejected facial challenges like the one here.   *See, e.g., United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) (concluding § 922(g)(1) is facially constitutional); *United States v. Hawkes*, 2023 WL 8433758, at *7 (D. Del. Dec. 5, 2023) (rejecting facial challenge to § 922(g)(1)); *United States v. Hedgepeth*, 2023 WL 7167138, at *7-9 (E.D. Pa. Oct. 31, 2023) (same); *Jenkins*, 2023 WL 6534200, at *16 (ruling § 922(g)(1) "is not unconstitutional in all of its applications" and denying facial challenge); *United States v. Reichenbach*, 2023 WL 5916467, at *5-6 (M.D. Pa. Sept. 11, 2023) (affirming the facial validity of § 922(g)(1) and denying facial challenge).   This Court, too, finds § 922(g)(1) is constitutional on its face.

## IV.  CONCLUSION

For the above reasons, this Court **DENIES** Defendant Robby Velazquez' motions to suppress physical evidence (Docket No. 10) and to dismiss the indictment (Docket No. 12).

An accompanying Order as of today's date shall issue.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

Dated: January 4, 2024

31